(30 Misc. Rep. 499.)

### MUTUAL BENEFIT LOAN & BUILDING CO. v. LYNCH.

(Supreme Court, Special Term, Kings County. February, 1900.)

1. BUILDING AND LOAN ASSOCIATIONS—USURY.

Laws 1892, c. 689, and Laws 1894, c. 705, authorized the organization of building and loan associations for the purpose of accumulating savings, and the loaning of such accumulations to members. Plaintiff association was organized under such law, and its capital stock was partially derived from the sale of paid-up stock. It made a loan bearing 24 per cent. interest to defendant, who had no intention of becoming a member of the association, but who unwittingly signed an application for shares when the mortgage was executed. *Held*, that the contract was usurious and void, as the building and loan law could not be made to authorize the loaning of accumulated capital at a usurious rate of interest.

2. SAME.

Where a building and loan association exacts an advance payment from a member as a consideration for making a loan, in addition to the legal rate of interest, the contract is usurious.

Suit by the Mutual Benefit Loan & Building Company against Mary E. Lynch to foreclose a mortgage. Complaint dismissed.

Wyckoff, Statesir & Frost, for plaintiff.
McKenzie & Beebe, for defendant.

MAREAN, J. The plaintiff is a building and mutual loan association, having its offices in the Mechanics' Bank Building in Brooklyn. It was incorporated in 1893 pursuant to article 5 of chapter 689 of the Laws of 1892. Article 5 was amended by chapter 705 of the Laws of 1894. By the latter act associations already organized were permitted to reincorporate under it (sections 192, 193);

but the plaintiff has not availed itself of that permission. Nevertheless, the recital in the amended act of the subject and purpose of such associations must be regarded as applying to those already formed. Section 171 of the amended law is as follows:

"The object and purpose of such associations shall be to encourage industry, frugality, home building and savings among its members, the accumulation of savings, the loaning of such accumulation to its members," etc.

By section 170 it was provided that every such association thereafter incorporated should have as part of its name the words "Co-operative Savings and Loan Association." The central idea of the association contemplated by the legislature was co-operation among people of small means. The statute of 1892, as well as that of 1894, contemplated an association of persons to whom the obligation of a small weekly or monthly contribution would be a stimulus to continuous saving. 2 Laws 1892, p. 1914, subd. 11. It contemplated the accumulation by such contributions of a fund, to be increased by legitimate interest, and which might be borrowed by members of the association to aid them in procuring modest homes. It contemplated the possible payment of some amount in excess of legal interest called a "premium," not for the purpose of larger profit by the association and those interested in its funds, but as an unavoidable means of determining which of the members should have the loan; and it was provided that the payment of such premiums should not be deemed a violation of any statute against usury. The encouragement of frugality and saving, the accumulation of a fund by periodic small contributions, and the increase by lawful interest of the fund thus accumulated, which should constitute a borrowing fund within the reach of members, at substantially legitimate rates, were the objects of the legislation in question. The permission to pay and receive a premium above legal interest was an unfortunate but unavoidable incident of the scheme, never intended to be perverted into a license to carry on a business consisting mainly of the loaning of large capital at usurious rates. It was never intended to create corporations which, representing already accumulated capital, should have a monopoly of the business of usury. The evils and oppressions of usury are none the less shocking because the payor has a remote fractional interest in the fund to which the usury when paid is added. The statute of 1892 does not permit the issuing of what, in the plaintiff's certificate of incorporation and in its by-laws are termed "income shares" and "prepaid shares." The issuing of such shares is a departure from the whole spirit and purpose of the law. It provides a means of immediately realizing, out of the stores of wealth, a capital without limit, with which to enter the loan market, and at the same time attracts to the subscription for installment shares not those thrifty and industrious persons whose purpose is primarily to save, but a class of needy borrowers ready to pay usury. Thus what was intended to be a co-operative savings and loan association is perverted into an association for the loaning of already accumulated capital at usurious rates to all comers who are willing to cover up the usury by an acceptance of installment shares. That is

the character in which the plaintiff presents itself. It is doubtful, therefore, if the plaintiff is in any case entitled to the protection against the usury laws given by the law of 1892. It is only the painful savings of frugality accumulated by periodic contributions which may be loaned at a premium without falling under the condemnation of the usury laws.

The defendant in this case was in search of a loan on mortgage, her property being already incumbered by a mortgage of $2,500. She went to a loan broker, where she signed a written application for a loan, addressed to the plaintiff, and the plaintiff, a few days later, loaned her $500 at 24 per cent. interest per annum, payable monthly in advance. She did not wish to become a member of the association. She did not know that she had become a member of it, but, on the closing of the loan, at the plaintiff's office, she signed, unconsciously, with the bond and mortgage, an application for membership, and was given a certificate for 15 shares of installment stock in the association. If the main purpose in such a case is the obtaining of the loan on the part of the borrower, and the making of the loan on the part of the company, and the issue and taking of the shares is only resorted to in order to avoid the usury laws, the loan is usurious if more than 6 per cent. is exacted, and all obligations for its payment are void. That such is the character of the transaction is a conclusion that cannot be escaped in any case where a person, not a member, applies to the association for a loan, which is made to him at a usurious rate in connection with the issuing to him of a certificate of shares. The issuing of the shares constituting the borrower a member of the association is a mere cover for the usury, as plain matter of fact, and it is time it should be so declared.

The plaintiff, at the time of the delivery of the certificate of shares, and the closing of the loan, further exacted from her, and deducted and kept out of the amount loaned, $45,—six months' dues at 50 cents a month on each of the 15 shares then issued to her. She was not, even if she had become a bona fide member on that day, under any obligation to pay these dues, and the exaction and payment thereof in itself tainted the loan with usury. Their payment was exacted in consideration of the loan, in addition to legal interest and to the other usury. It is true this $45 dues was credited to the defendant as invested capital in the account opened with her, and was in part payable back to her in case she should pay off the mortgage and withdraw from membership. But it was payable back without interest for a period, and at 4 per cent. during another period, and at 5 per cent. during a further period, and only with certain deductions for expenses. By-laws, art. 4, § 3. So that, in any event, the payment of these dues was a matter of value to the plaintiff, and of prejudice to the defendant.

But it is not necessary to hunt for usury in this transaction with a candle. Every tissue of it is rotten with usury. The character of the business done by the plaintiff is as follows: It issues its shares from time to time, without any limit, to persons desiring them. Such shares do not mean, when issued, an interest in ex-

isting assets, if any, of the company. The holder of installment shares pays into the treasury of the association certain sums monthly called "dues," and an account is opened with him, in which he is credited with the amounts so paid. If his shares are "prepaid shares" or "income shares," he pays in at once a fixed sum in lieu of all dues, which is put to his credit,—$53 on income shares, and $65 on prepaid shares. Thus a capital is created to be manipulated for a profit, by loaning it to members. Once a year the profits are ascertained. They consist, after deducting expenses, of the legal interest and premiums in excess of legal interest received from members upon the loans to them, together with the fees for transfer of shares (insignificant in amount) and the fines paid by the members for delinquency. These profits are, once a year, divided among shares in proportion to the average amount to their credit respectively, during the then ended year. Dividends, except on income shares, are not paid over to members, but put to their further credit on their respective accounts. When the amount to the credit of any share reaches the sum named in the certificate as its par value ($200 for installment shares and $100 for prepaid shares), it is said to be matured, and the amount is to be paid over to the shareholder, and the certificate surrendered and canceled. The dividend on income shares ($100 par value) is limited to 6 per cent. on the par value, and this is paid over to the shareholder semiannually, instead of being accumulated like dividends on other shares. Income shares are issued on payment of $53. The holder may surrender them on 60 days' notice and receive $50. This makes a brief, but complete, outline of the scheme of the company's business.

The company advertises that installment shares, class B, to which defendant's shares belonged,—i. e. shares calling for 50 cents a month dues,—will mature in 11 years. The holder of such shares has, they advertise, only to pay 50 cents a month in advance on each share for 11 years, and the association declares itself able to then return him therefor $200. Fifty cents a month is $6 a year, and amounts at the end of 11 years to $66. The average capital of the shareholder which may be kept at interest by the company during the 11 years is $33. The profit which the company gets out of it, and returns to him at the end of 11 years, is $134. The plaintiff claims to make its funds earn interest, compounded every month, because it exacts interest on its loans monthly in advance, when such interest can itself be gathered up and loaned. Theoretically, this is possible; practically, the total of interest must, of course, fall short of the theoretically possible amount. Compound interest at 6 per cent., compounded every month for 11 years on $33 average capital, is less than $31. Yet the company undertakes to realize for him, by the use of his money, $134, being more than four times $31, more than four times compound interest at 6 per cent. compounded monthly. Of course, all shareholders receive the same rate of return on the capital contributed by them (except holders of income shares). In a pamphlet published by the association in the present year will be found the following statement (page 17): "It is estimated that class B shares will mature in eleven years.

Credits have been made pro rata at this rate for the past five years, after doing which the company has a comfortable surplus." In the same connection will be found a statement that the company has assets of about $1,000,000. On page 16 will be found the following: "Fully-paid six per cent. income stock is issued upon a cash prepayment of fifty dollars per share and three dollars premium, upon which dividends at the rate of six per cent. per annum, payable semiannually, will be paid on the par value." The par value is $100. See by-laws, art. 4, § 3. That is to say, the association will borrow money for use in its loan business, and pay more than 11 per cent. per annum for it, payable semiannually. This throws confirmatory light upon the extraordinary profits which the association is able to realize. It must, then, be accepted as a fact in the case that the usurious interest upon loans, in excess of legal interest, collected under the name of "premiums" by the company from its borrowing members, together with fines for delayed payments, which are at the rate of 60 per cent. per annum upon the payment delayed, amount to a grand total sufficient to pay all the expenses, which are annually $2\frac{1}{2}$ per cent. of its assets,—i. e. of all its loans (see pamphlet, p. 20),—and leave a residue of 18 per cent. per annum upon every dollar contributed by shareholders to its capital; in other words, that the usury alone amounts to more than 20 per cent. on all loans. How this can be done is illustrated by the very loan in question in this case. The loan was $500. The first mortgage was $2,500. The association did not pay the first mortgage, but only conditionally assumed its payment, and plaintiff's mortgage was made for $3,000 instead of $500. The defendant paid interest at 6 per cent. per annum, monthly in advance, on the $500, and also on the $2,500. The interest received on the $2,-500, plaintiff, of course, paid over to the holder of the $2,500 mortgage, but only at the end of each six months, thus realizing interest on the interest for the period between its receipt and its payment. It then exacted, payable like the interest, monthly in advance, a premium of 3 per cent. not only on the loan, but on the amount of the first mortgage, to wit, 18 per cent. on the amount of the actual loan. Had the first mortgage been only $1,500, the premium would have amounted to only 12 per cent.; had it been $5,000, then to 33 per cent. on the loan. Thus the plaintiff realized in this case on its loan of $500, 24 per cent. interest, which it received monthly in advance. Each month the defendant, as shareholder, was also paying dues of 50 cents a month on each share, amounting to $7.50 a month on 15 shares, which was put to her credit. But the 24 per cent. interest and premium which the defendant paid, not as a shareholder contributing capital, but as a borrower, for the use of the money, went into the fund which at the end of the year was, after paying expenses, to be divided among all shareholders who should stay in till the end, as profits. But the truth is that no borrowing member, or only here and there one, stays in to the end. The burdens which are put upon him are too grievous to be carried for 11 years. The case must be very rare where any person in such straits as to accept a second mortgage loan at 24 per cent. is

of sufficient substance to stand the strain for 11 years. He has, besides, to pay his dues, a further 18 per cent. per annum, making in all 42 per cent. per annum. He has to keep up the interest on the first mortgage, and pay his taxes. On any possible theory of chances, 90 out of 100 borrowing members will fall by the way. The moment the borrowing member fails to meet any of his payments, he is charged 60 per cent. per annum on the payment delayed. Finding himself in such straits, suppose he wishes to withdraw, and end his disastrous connection with the association. He is allowed as the surrender value of his shares only the dues he has paid, with interest at 4 per cent. during the second six months, at 5 per cent. during the second year, and from that on at 6 per cent. (less certain deductions for expenses), in reduction of his mortgage, but only provided he can then raise and pay the balance in cash. In some cases, no doubt, he does that; but he is not likely to be able to do it since he is not even able to meet his monthly payments. The result is that his payments one after another fall in arrears, and, swollen by 60 per cent. per annum of fines, are charged against the pitiful surrender value of his shares until it is extinguished, when the association is relieved of its assumption of the first mortgage, and thereupon proceeds to foreclose its own mortgage. That is what happened in this case, and that is what, in the nature of things, must happen in most cases. All that the borrowing member has paid in dues, fines, and premiums is swallowed up by the association, and divided as profits among the investing members. Even if he pays up his mortgage without foreclosure, he leaves behind him all he has paid in premiums and fines. The association counts on this result, and in that reliance holds itself out as able to afford to shareholders profits amounting to 24 per cent. on their investment. It is perfectly patent that from first to last not a penny goes into the treasury of the association except out of the pocket of some shareholder, and, if each were to get back again at any time the money paid in, except the lawful interest paid on loans, and get it back just with 6 per cent. compound interest, there would be nothing left even to pay expenses with. The expenses being 2½ per cent. of the assets annually, each member could only get his money back after the payment of such expenses with something like 3½ or 4 per cent. interest. Yet this plaintiff advertises to pay it back with 24 per cent. interest. It is manifest that all these exorbitant profits, if the representations of their existence be true, and not a piece of fraudulent deceit, are simply the bones and blood of those wretched usury-ridden borrowing members who have fainted and fallen by the way. Is this plaintiff that benevolent and helpful thing which the statute contemplated, or is it a monster of greed and oppression, masquerading in its garments. If the statute is susceptible of such perversion as this case discloses, it is a disgrace to a civilized state, and until it is wiped from the statute book it is the duty of courts to be vigilant to repress, so far as may be, the crying evils which shelter themselves under it.

Complaint dismissed.